The last case on today's calendar, Cascade Forest Conservancy v. United States Forest Service. All right. You may proceed when you're ready. Good morning, your honors. My name is Susan Jane Brown, representing plaintiff appellants in this case. With me at council's table is Marlee Goska, who is also with me on the briefs. I'd like to reserve about five minutes of rebuttal time, please, if I may. So this morning, I'd like to begin with some context. Biologist and professor emeritus at University of Washington, Dr. Roger Del Moral, who literally St. Helens evolve after the eruption of 1980, said in comments on this project challenge and this litigation, the research being done on Mount St. Helens is unique, a word I do not use lightly. Nowhere in the world, ever, and probably never again, has so much first-rate science been conducted in one large ecosystem by so many dedicated and accomplished scientists. Similarly, ecologist Dr. Carrie LaRoy, in comments on the project, said, building a road across the Pumice Plain would irreparably harm the development of these watersheds and negatively impact our research and our ability to explore in-stream primary succession. The proposed road building is not a limited pulse disturbance, but a continuous press disturbance in a fragile ecosystem. She testified, I am a professional ecologist who has conducted work on the Pumice Plain since 2014, and I can attest that these proposed actions will result in significant impacts. Once the road is built, the science that follows will never be able to differentiate between natural recovery and indirect effects from the road, thus effectively ending all natural succession-related research on the Pumice Plain. To assess these significant impacts in this very special place, the Forest Service should have prepared an Environmental Impact Statement, or EIS, to consider the direct, indirect, and cumulative effects of the project, which is simply the first step in a long-term management plan for Spirit Lake. Instead, the Forest Service concluded that there would be no significant impacts from the project, despite the facts before the agency and the numerous significance factors warranting the preparation of an EIS. The Forest Service also failed to prepare a lawful forest plan amendment, instead exempting the project from forest plan requirements necessary to protect the visual quality on the Pumice Plain. So this morning, I'd first like to return to the requirement to prepare an Environmental Impact Statement, and then turn towards our claim regarding the forest plan amendment, if I might. So first, Your Honors. Under the National Environmental Policy Act, an EIS is required if a project may have significant effects. And that determination is based on the context and the intensity of the project. There are 10 significance factors under the NEPA regulations. And as this Court has frequently stated, the presence of one significance factor is enough to trigger an Environmental Impact Statement, and this is the Ocean Advocates case. In this case, we actually have several significance factors that are in play, and I'd like to start with the first one, which is actually the eighth significance factor, and it's the degree to which an action may cause the loss or destruction of significant scientific, cultural, or historical resources. Here it is undisputed in the record that Mount St. Helens National Volcanic Monument, the research resources. In the record, the Forest Service has stated that, quote, the research being done on Mount St. Helens is unique. Excuse me, this comes from our friend, Dr. Del Moral. The research being done on Mount St. Helens is unique. Again, nowhere in the world, ever, and probably never again, will so much first-rate science have been conducted in one large ecosystem by so many dedicated and accomplished scientists. In the record, it's also fairly clear that the researchers who are doing the work on Mount St. Helens and the Pumice Plain explained in painful detail how this project would cause the loss and destruction of their work and the significant impact on human knowledge that it would cause. The Forest Service offered a very anemic response to this overwhelming outpouring of scientific concern, and the agency said, quote, that it truly values and understands the importance of research and science at the monument. That's literally the only thing that the Forest Service said in response to this outpouring of scientific concern about the impact that this project would have on their research. And it's important to note that the value of- Can I ask a- Yes, you're welcome. Can I ask one? So, the Forest Service did do some analysis of the effects of scientific research, such as by looking at the number of parcels and projects that would be affected. Does a hard look at scientific research require a qualitative analysis as well as a more quantitative analysis? Yes, Your Honor. In this instance, the law does require that kind of analysis. Here what the Forest Service simply did was to identify how many numbers of sites that may be affected by the project, and the record is also clear that it did not contact- the Forest Service did not contact all of the researchers working on the Pumice Plain. It only contacted some of them. So the agency has an incomplete knowledge of the number of sites that were affected, and all it simply said was that these sites would be affected and that some of that research may not continue in the future. But just in terms of what you've presented, this declaration from an obviously very qualified person talking about the importance of that area for scientific research, but were you required to and did you address the ability of those projects to perhaps be duplicative of ones that would not be affected or whether they could be relocated or sort of any of those types of issues, or was that not your responsibility going forward? So the Forest Service should have done that kind of analysis but did not do that here. The Forest Service never looked at could we- are some of these studies duplicative or some of those sites for some of the studies duplicative? Could we move them elsewhere? The agency never did any of that kind of analysis, Your Honor. Instead, what the agency prescribed was a list of project design criteria that it indicated would likely or could perhaps mitigate some of the impact to those studies. But I think it's important to take a look at what those project design criterias actually are. And they are things like we're going to ask the researcher, again, whose life's work is being destroyed by this project, to consult with the Forest Service about moving that site or minimizing the impact, which, again, minimization of impact is not actually environmental analysis under the National Environmental Policy Act. It's simply a criteria that is supposed to minimize the harm, but the agency actually needs to do the analysis to figure out what that harm is before the agency can know if those mitigation measures are adequate. And the agency simply did not do that here. If I may, just I hate to monopolize your time. I just have one other question. Is the sort of magnitude of the threat to the lower level communities, the sort of immediacy of this lake overflowing and putting at risk communities and individuals, does that play a role in how you think about this lawsuit? Well, there are a number of factors that I think are in play here. Certainly the Forest Service and plaintiff repellents do not disagree that we need a long-term solution to Spirit Lake. We've known that. The Forest Service has known that since the eruption in 1980. We're dealing with a temporary solution that has some issues and needs to be addressed. Again, that also goes to the failure to consider the direct, indirect, and cumulative effects of this project. The agency knows... Right, but how immediate is the threat? That's what I want to know. So the threat is not immediate. It is a threat. The record is very clear that there would have to be a complete tunnel failure. There would have to be a significant rain or snow event to put water into Spirit Lake to cause the level to rise. The agency would have months, if not longer, to warn downstream communities and take immediate action should those conditions present themselves. But that's simply not the case here. We've got plenty of time to decide and make emergency decisions if that situation were to arise. But why get to the point, again, where there might have to be an emergency decision as the proposal right now to avoid that emergency situation? Well, that's a good question, Your Honor. Unfortunately, the decision, the agency action that we have here is not that final, what do we do about Spirit Lake? The project decision, the final agency action here is twofold. One to replace the aging gate that keeps debris from entering the Spirit Lake tunnel, and then also to conduct geotechnical drilling out on the Spirit – or on the Pumice Plain. And so neither one of those two actions are going to actually address the potential overtopping of Spirit Lake. That's that future management action that the Forest Service has begun to analyze. They've got a contractor under contract to do that work, meaning that that is in fact reasonably foreseeable. And that action, that long-term management of Spirit Lake, as well as this action being challenged in this case, should have been analyzed comprehensively in an environmental impact statement. We should do all of that analysis at once, perhaps in a phased approach, as the Timok case discusses phased NEPA analysis. The agency can absolutely do that analysis and do it in a thoughtful way, given the dramatic impact that this road will have on this very sensitive place. All right, Your Honor, if I may move on. So again, the value here of the Pumice Plain is that it's an ecological blank slate, which gives researchers the ability to study ecological succession. The project will irreparably compromise that ecological setting. And the effects cannot be mitigated. We pointed to places in the record where the Forest Service, as well as expert scientists who commented and objected to the project, explained that, in fact, this – the impacts cannot be mitigated from building this road. So that is one significance factor that clearly has been triggered in this case and should have resulted in the preparation of an environmental impact statement. Another factor – significance factor is that this project will have highly controversial effects. And as this Court has held, a project is highly controversial if there is a substantial dispute about the size, nature, or effect of a major federal action. And that dispute is clearly present here. We have dozens of expert scientists who are experts, world-renowned in their fields, telling the Forest Service that this project is a bad idea and is going to have significant ecological effects in addition to significant effects on research. And the Forest Service never responded to this issue in briefing. The Forest Service has acknowledged that it actually doesn't have the expertise it needs to adequately affect or analyze the effects of this project. And in fact, the Forest Service has recognized that it's making, quote, educated guesses about the environmental outcomes of this project and has also said that its effects analysis is largely conjecture because it simply doesn't know what the effects of this project are going to be given the unique ecological setting of the Pumice Plain and Mount St. Helens. We've never built a road like this before in this setting. And so that suggests that there is a significant amount of controversy here that the Forest Service simply never responded to. So, if Your Honor, if there's no questions on that, I'd like to move on to discuss briefly the Forest Plan Amendment issue. And I have a question for you on that. Sure. You cite the Fourth Circuit case, I'd like you especially to specify why that Fourth Circuit case, you cite a few, but there's one from this year. Why you think if we were to disagree with that, we would be creating a circuit split and so forth? Yes. Thank you, Your Honor, for that question. So, again, we do, we are looking at three Fourth Circuit cases. They're dealing with the exact same issue that is present in this case. The most recent of those cases really looks at what happens because some of these cases have been through the Fourth Circuit a couple of times, so they're coming back around. And so they're evaluating what the Forest Service has done in response to the court's orders. And in that most recent case, what the agency, or excuse me, what the court was really looking at is, and puts a fine point on, is that if you do a Forest Plan Amendment and you eliminate Forest Plan requirements, like what the Forest Service has done here, they're just saying, we're not going to comply with the visual quality requirement of retention because you can see where the project is going to take place from pretty much everywhere in the monument. And these are the most viewed areas of the monument. But what the Fourth Circuit did in its case this year was say, okay, so if you are exempting a project from Forest Plan requirements and you aren't replacing that exempted Forest Plan requirement with additional new substantive requirements regarding that issue here, visuals, then you are not actually undertaking an amendment under the 2012 planning rule. And that's what the planning regulations require at 36 CFR 219.17b2. That provision of the regulations requires Forest Plan amendments to be done under, done under the 2012 planning rule. And you can't do an amendment under the 2012 planning rule if you simply don't apply its requirements. And here the Forest Service didn't actually apply those requirements, those substantive provisions of the 2012 rule. They just simply brushed them off and decided to exempt the project from the visual quality requirements because the project can't meet them. And there's no way to meet those, that requirement given how visible this project area is from the most viewed areas of the monument. So I see that I am a little bit over my rebuttal time, so I think I will reserve the rest of my time. Very well, thank you. Thank you. May it please the Court, Robert Lundman representing the Forest Service. I'll start with the road and the impact or potential impact on the scientific research. As an initial matter, the road is not a new road. There was a road there in the 1980s, and that was the road that the Forest Service and the Corps used to build the tunnel, build the dam, and to do some limited geotechnical drilling back then. And so this project authorizes a road along that same route with flexibility built in to deviate around research plots. So there's both a road corridor that's 16 feet wide and then a disturbance corridor that's wider. And the idea is that the Forest Service, when it comes time to build the road, can then move away and around research plots to the best of their ability. As to the research plots, the Forest Service's analysis was not anemic here, as Plaintiff's Counsel says. It was thorough. They looked at it in a few different ways. First, they plotted the plots, so a map layer, over this area so they could assess where the plots that they knew about were and then assess the potential routes here, the one they chose, which goes over the 1980s road and another route that would avoid the 1980s road but be a new road construction from scratch. And the assessment shows impacts on about 85 research plots from the road, maybe 83. Two of them are from the drilling area. And so it's a qualitative assessment and a quantitative assessment, both of the number of research plots impacted, and it's 80 out of more than 800 or 900, and then a qualitative assessment of what does that mean for the research. Now what Plaintiffs want is more. They want not just an overall assessment of the research impact, but they want a study by study assessment or a researcher by researcher assessment, and that's not what NEPA requires here. NEPA's focus is on environmental impact on resources, and that's one of the intensity factors that they cite. And the resource here is the Pumice Plain, and the Forest Service's analysis in the environmental assessment and the specialist report about research and other specialist reports focuses on the resource as a whole and the Pumice Plain and not a study by study approach to impact, which is unworkable. There have been hundreds of studies set in the Mount St. Helens monument, and it just isn't workable, the idea that the Forest Service would go and look at each study individually and assess the impact on that study and on that researcher, and that's not what NEPA requires. NEPA is focused on environmental impact. This court's decision in the Bicycle Trails Council case, which we cite, makes that clear as well. Second, the project design criteria, plaintiffs don't think those are sufficient. There's two problems with our argument on this point. First, in the district court, the project design criteria are not hidden here. They're set forth in the decision notice authorizing this project. In the district court, the only time plaintiffs mention the project design criteria are in their argument about the aquatic conservation strategy, and they don't make that argument on appeal. So they haven't made this argument that the project design criteria are insufficient in district court, and so it's not preserved here. If you look at the criteria, they're not just empty promises. They commit the Forest Service to minimize impacts on research plots. They explain this disturbance corridor idea that I already talked about, and so they have a real bottom-line difference for research impacts here. So our submission is the Forest Service both took a hard look at the research impacts here, and an EIS is not required, and I would urge the court to take a look at the environmental assessment that's at 676 to 78 in the third environmental, third excerpt of record volume. That's where the EA walks through the research, and then the supplemental excerpts of record 104 to 124 is the specialist report on this research that is going on in the area. And to be clear, the Forest Service acknowledges this is important research. Forest Service employees are researchers as well, and so this is not an instance where the Forest Service is ignoring this or looking the other way. They're concerned about it too, and they want to minimize it, the impacts. It's just not a significant impact on an environmental resource that requires an EIS at the end of the day. The question – there's a question about how immediate is the threat. The Forest Service agrees that it's not an immediate threat, but it is a pressing threat. The gate needs to be replaced. The gate is the original gate from the 1980s. It is a gate that could fail. There's no bend to it. If it breaks, it's going to break, and water will go shooting into the tunnel. Obviously if the tunnel needs additional repairs, that's a bigger question, but it's a real danger to the folks who work on the tunnel to keep it up and running. And then the other part of the project is the geotechnical drilling. And there, the debris blockage – you know, what happened is the eruption occurred. All this debris went into Spirit Lake and raised the level of Spirit Lake 200 feet and then also blocked the outlet to Spirit Lake. And in the 1980s, you know, there was some sampling of that debris blockage, but the – no one's contesting this – is incomplete, uncertain, and I think as the Forest Service describes it, it's assumptions based on assumptions based on nearly 40-year-old data. So this geotechnical drilling, which the road is necessary to get to the right place with the drills to do so, is really important to assess, you know, where the debris blockage is, what it's made of, and then the groundwater situation. And all those will assess, like, how pressing this need is for a longer-term solution here. Opposing Council mentioned that as well. That process is just in its infancy and is really complicated. The whole volume 5 of the excerpts of record is a National Academy of Sciences report that plaintiffs submitted, and it just talks about the process for assessing the problem without really opining on how the problem can be assessed. And it's 250 pages of detailed analysis about how to frame up the problem. So this is not an easy combination where the Forest Service could have waited and said, okay, we're going to wait on these two aspects of this project until that larger planning effort is done, because that larger planning effort is going to take a lot of time and effort by a lot of people who are interested in how this is resolved. The downside of waiting for a more emergency situation is not just because that would be bad for the area, but it would also be bad for this research. The short-term emergency action would require greater impacts on the Pumice Plain than this thought-out, planned action to build a temporary road across the path of the existing 1980s roadbed, and then get rid of the road when the project's over. They're going to reclaim the road. They're going to recontour the land. And while the road – all the impacts won't necessarily go away immediately – the visual impacts, plaintiffs are concerned about, and the research impacts will be mitigated by the post-project plans and requirements here to not just leave the road as is. As to controversy, you know, our brief sites – cases from this court, the controversy factor – that's one of the ten factors about intensity, and intensity goes to whether an EIS is required or not required. Controversy here isn't just opposition. It has to be controversy and uncertainty about the impact of the project and the project on the resources at issue here. And we think if you take a look at the EA and the rest of the Forest Service's analysis, there's no real controversy here about the project's impacts. What there is is opposition, and that alone doesn't trigger that factor or require an EIS. So, unless the court has further questions about NEPA, I'm happy to move on to the NFMA forest plan issue. Yeah, and I have the same question I had for opposing counsel in this case. It seems to me that their argument is that, you know, if we go your way, we're creating a split with the Fourth Circuit. And I'd like to hear – maybe you agree with that, or maybe you disagree with that, but I'd definitely like to hear your views on that. Well, I think there's a way you could rule for us on that without creating a split in the Fourth Circuit. In that case, the Wild Virginia case, that's the most recent one. I'll back up and talk about the other ones, too, in a minute. But in that case, there are two key considerations that are just completely lacking here. And the first is the Fourth Circuit had already concluded that the Forest Service, quote, did not sufficiently consider the project's actual sediment and erosion impacts. So the ruling the Fourth Circuit made about the plan and the amendment of the plan, when the court got to that part of the ruling, it cites back to its earlier analysis of the flaw and the analysis of erosion and sediment. And that's – we don't have that same flaw here. So that's number one. Number two is – and another quote from that opinion is that the court did not have a clear indication from the other federal agency that was analyzing environmental impacts about the environmental impacts of the stream-crossing method at issue. So the court then was, quote, unclear whether the amendments to the Jefferson Forest Plan for the project will even maintain the forest's resources as the 2012 planning rule intended. And again, that's not the case here. There's no missing analysis. There's no uncertainty about that analysis, especially with respect to the visual impacts. And that's the part of the Forest Plan that plaintiffs have challenged the amendment to. Here, the Forest Service has both explained what's going on with the visual impacts, set forth – so the plan here says there's two levels of visual impact protection, and this area is all in the retention, the higher-level area. The Forest Service then analyzed the impact on that area from this project and reasonably concluded that the plan could be amended consistent with the 2012 planning rule. And in doing that, it walked through all the steps that are required. It first identified two of the requirements in the planning rule that are, quote, directly related to the project. And quick aside, the other Fourth Circuit cases, this is the step that the Forest Service erred at according to the Fourth Circuit. But here we have that identification of two requirements. Both relate to scenic protection, scenic character, and scenic values. So we've checked that first box that the Fourth Circuit had a problem with in the other cases that plaintiffs have cited. It then assessed those impacts both qualitatively and quantitatively. And there are maps in the record and the decision notice and the environmental assessment that show the viewsheds – and this is kind of the qualitative analysis from the Windy Ridge and the Johnston interpretive sites and locations – and sets forth, like, where – what people will be able to see on the Pumice Plain from the road, from those sites, as well as from the area where the drilling will occur. And it's not the whole area. It's a substantial amount of it, but it's not right to say it's everywhere. There's a pink-shaded area where the visual impacts are. Then the Forest Service quantitated that – did a quantitative analysis of that as well and explained that, look, it's 0.5 percent – not of the whole forest, but of the retention area in the monument. So the highest protection area was the denominator the Forest Service used in the monument, and then compared the visual acreage impact to that area. And that is completely consistent with the planning rule. That is, the planning rule instructs agencies to look at the scale and scope of the amendment, and that's what the Forest Service did here. It didn't look at it in a vacuum. It didn't look at it across unrelated landscapes. It looked at it at this landscape and did both a qualitative analysis of how the view will be impacted and a quantitative. At the end of the day, it approved this amendment. And the amendment, to be clear, is not a permanent amendment. It lasts for the length of this project and lowers the level from retention to partial retention for this project area. And then when the road is removed from the landscape at the end of the project and is removed, the visual impact will go away. It will appear as it did beforehand, and in some ways, it will appear less visible than it does now because in the 1980s, after the use of the road, the Forest Service just left it there. There was no reclaiming the road at the end of the project. And so while nature has reclaimed it in areas, in other areas, you can see the cutouts. And we cite to some pictures in the record showing where you can still see impacts from the road today. And the one place to see that would be in the supplemental excerpts of record. There's a specialist report on visual impacts that sets forth a bunch of photos of what the trail looks like today, but where you can also see ongoing visual impact from the road when it was built in the 1980s. So in sum, you know, we think the Forest Service took a hard look under NEPA, reasonably decided not to prepare an environmental impact statement, and then amended the forest plan consistent with the forest planning rule. And so the district court essentially got it all right on this case, and we ask that you affirm. But I'm happy to answer any more questions. Anything from my colleagues? No. All right. Thank you very much. Thank you. Thank you, Your Honors. So first I'd like to respond to opposing counsel's comments about the fact that we recognize in our brief that the Army Corps of Engineers did, in fact, build a road under emergency situation in response to a cataclysmic natural event back in the 1980s. But simply because the fact that the Army Corps built a road in 1982 does not mean that Not only is there not a lack of precedent here, but that doesn't mean that the road that the Forest Service is proposing to build this time around is not a significant impact on the environment. These situations are factually distinguishable. The Corps used the road for about two years, much less time than the decade or longer that the Forest Service will be using this road here. The road was originally constructed, again, in the wake of a volcanic eruption. That's a very different factual situation than what we have here. The road has also been used for non-motorized recreation exclusively since 1985. This project will change that situation. This road will be now a motorized road for about a decade or so. It is true that in many places today, when you go out on the Pumice Plain and you try to find that old road bed, it's no longer visible because it has not been used as a continue uninterrupted. That is very different than what is going to happen with this road. And furthermore, there is no evidence that the Forest Service can remediate a road in this environment. There is zero, zero evidence in the administrative record here that the Forest Service has been able to point to that says, yep, we've built a road like this before and we're sure that we can make the road impacts disappear, as what opposing counsel just said. That simply is not the case. You have ecologists, experts, biologists, stream ecologists in the record saying that simply is not true, is not possible to remediate a road like this to make it disappear. The Forest Service has never provided any information demonstrating that it can in fact do what it's saying it can do. And in fact, I'd point you to the record from Dr. Fred Swanson, who is retired Forest Service. So Forest Service expert, he was a research geologist. In his comments on the project, he said, I am very aware of unintended, unanticipated consequences of actions such as installation and use of roads and wildlands, which I've studied since the 1970s. For example, airborne dust and waterborne fine sediment from vehicle traffic, both the grinding action to produce fine material in the wind and water turbulence to launch it, may have far-reaching effects on terrestrial and aquatic ecosystems. And we have essentially no experience in dealing with such issues in a landscape like the Pumice Plain. I find the proposed mitigation measures lacking. In summary, I strongly advocate abandonment of the proposal to build a road across the Pumice Plain. This is the Forest Service's own expert saying, we don't know what we're doing out here. This road is going to have significant adverse impacts. What did the agency respond in the administrative record in response to that comment? Nothing. Silence. Silence. So, again, and this also goes to the issue of scientific controversy. There's a lot of science on one side saying that this road is going to have significant adverse impacts, and the agency in response literally said nothing. So again, looking at the question of mitigation measures, this is not a new argument on appeal. We're simply responding to what was the agency's rebuttal argument that, hey, we can provide mitigation to counteract the impacts of the road. We responded with pointing to evidence in the record that says, no, that's actually not true, that those effects cannot be mitigated. Posting Council also points out that long-term management of Spirit Lake is not easy, that it's complicated. And that's exactly why you prepare an environmental impact statement, because it is complicated. It is hard. It involves a lot of different factors that the agency needs to consider in a comprehensive environmental impact statement. Plaintiffs here are not saying don't do that, don't do this project at all, but rather are saying you need to do an EIS so that you thoughtfully consider all of these effects, that you are able to minimize the impacts of this road. And that's why an EIS should be required. And then finally, Your Honors, regarding the Forest Plan Amendment, the facts of Weill Virginia are really not that much different than those here. Here, as we pointed out in our brief, there is extensive uncertainty regarding the effects of this road. Again, you have world-renowned experts saying this is going to have significant impacts. And you also have the Forest Service acknowledging that they don't have the expertise to adequately assess these effects. And therefore, there is uncertainty about the consequences of this action, just like there were in Weill Virginia. Here, we're also talking about a very unique ecological setting. Given the context and intensity of where this project is going to take place, an EIS should have been prepared. The Forest Plan Amendment is not adequate under the 2012 Planning Rule. If this Court disagrees with the Fourth Circuit, we're definitely going to have a split. And that's not where I would counsel the Court to go. The Fourth Circuit cases are very well-reasoned on very similar facts. And therefore, the Ninth Circuit should adopt the Fourth Circuit's approach to these questions. Thank you, Your Honors. All right. Thank you, Counsel. Thank you both for your briefing and argument. Interesting set of cases today, wolves, riots, and explosions on mountains and volcanoes. So it sounds like a Jerry Bruckheimer movie. But with that, this panel is adjourned. Thank you, everyone. Please rise.
judges: OWENS, MILLER, Pregerson